**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHARLES M. OSZUST,**

        **Plaintiff,**

    v.                                **Civil Action 2:15-cv-2950**
                                           **Magistrate Judge Jolson**

**WESTROCK SERVICES, INC.,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Westrock Services, Inc.'s Motion for Summary Judgment.  (Doc. 38).  For the reasons that follow, the Motion is **GRANTED**.

## I.    BACKGROUND

Most of the facts relevant to this case are undisputed and are summarized as follows. Plaintiff is a former employee of WestRock Services, Inc., a paper and packaging manufacturer. (Doc. 1 at ¶ 2).  Despite Plaintiff's work as a union employee at Defendant's paper mill in Coshocton, Ohio for over twenty years (Doc. 35, PAGEID #: 122), his relationship with Defendant was less than stellar.  In Plaintiff's view, Defendant "treated [him] like dirt" beginning in 1992 or 1993 (Doc. 35, PAGEID #: 126–127; *see also* Doc. 36, PAGEID #: 224 (testifying that Defendant "always" treated him "like crap"), and Defendant represents that Plaintiff had "a documented history of unacceptable behavior" (Doc. 36-3, PAGEID #: 303).

This employment action arises from Plaintiff's assertion that he suffers from diabetes and back problems that require him to avoid "overly-stressful situations" and sedentary positions for long periods of time.  (Doc. 1 at ¶¶ 10, 12).  Plaintiff also suffered a heart attack in October

2013.  (Doc. 35, PAGEID #: 124).  On November 14, 2013, Defendant informed Plaintiff that he would be promoted from the position of Pulp Mill Operator Helper, a position which he had for approximately seven years, to the position of Pulp Mill Operator.  (Doc. 36, PAGEID #: 259–60; Doc. 1 at ¶ 13).

The Pulp Mill Operator position was not new to Plaintiff.  Indeed, he had requested and received training for the Pulp Mill Operator position and had worked in that position for approximately six weeks in spring 2013 while another employee had a medical issue.  (Doc. 35, PAGEID #: 138, 141).  Pulp Mill Operators earn $1 more per hour than Pulp Mill Operator Helpers (*id*., PAGEID #: 138), and Plaintiff was next in line for a mandatory promotion under the union contract (Doc. 38-1, PAGEID #: 412 at ¶ 3).  After learning of the promotion, Plaintiff contacted the company nurse, stating that the Pulp Mill Operator position's physical and mental demands would have an adverse impact on his health.  (Doc. 1 at ¶ 14).  The nurse referred Plaintiff to management.  (*Id*. at ¶ 15).

Plaintiff then complained to management, reiterating that the Pulp Mill Operator position would cause him to suffer physical and mental stress and was too sedentary given his health conditions.   (*Id*. at ¶¶ 16–17).   Plaintiff alleges generally that Defendant denied him a "reasonable accommodation" and a "medical freeze" but failed to provide him with any explanation for its decision.  (*Id*. at ¶ 18).

Despite his objections, Plaintiff began work as a Pulp Mill Operator on November 18, 2013.  (*Id*. at ¶ 19).  Plaintiff claims that his first shift caused him to suffer job-related stress and anxiety and diabetes-related symptoms including back and leg pain, blurred vision, lack of concentration, and headaches.  (*Id*. at ¶¶ 19–20).  Plaintiff reported to work the next day despite little sleep.  (*Id*. at ¶¶ 20–21).

Plaintiff began to experience shortness of breath and back and leg pain during his second shift. (*Id*. at ¶ 21). With a co-worker watching his post, Plaintiff "walked outside of his office in an attempt to breathe fresh air and stretch his legs and back." (*Id*. at ¶ 22). Plaintiff explains that "[i]mmediately after leaving the office," he suffered a stress-related syncopal episode, during which he lost consciousness and fell down stairs. (*Id*. at ¶¶ 23–24). Plaintiff was hospitalized following the incident. (*Id*.).

Plaintiff sought to return to work on January 6, 2014, after obtaining a release from his doctor. (*Id*. at ¶ 25). Plaintiff claims that Defendant refused to allow him to return to work. (*Id*. at ¶ 26). During that time, Defendant required Plaintiff to have an independent medical examination ("IME") to assess his ability to return to work. (Doc. 38-1, PAGEID #: 412–13 at ¶ 4). The IME was conducted by Dr. Sushil Sethi, who opined Plaintiff was unable to return to work. (Doc. 38-1, PAGEID #: 413 at ¶ 4; Doc. 36-5, PAGEID #: 317–22). Defendant met with Plaintiff to inform him of Dr. Sethi's opinion. (Doc. 38-1, PAGEID #: 413 at ¶ 4; Doc. 35-14, PAGEID #: 214–15).

Plaintiff returned to work on June 6, 2014 (Doc. 38-1, PAGEID #: 413 at ¶ 4), which he claims was allowed only because he hired an employment attorney (Doc. 1 at ¶¶ 26–28). Six days later, on June 12, 2014, Plaintiff had a verbal altercation with John Cullison, his union representative. (*Id.*; Doc. 36, PAGEID #: 256). On June 24, 2014, Defendant held a discipline meeting during which Plaintiff signed a "last chance agreement" that cited the nine incidents of his unacceptable behavior. (Doc. 36-3, PAGEID #: 303–304). Plaintiff understood the agreement to mean that he "would be terminated if any future work issues arose." (Doc. 1 at ¶ 29).

Plaintiff submitted his retirement paperwork less than three weeks later on July 12, 2014. (Doc. 36, PAGEID #: 223; Doc. 36-4, PAGEID #: 313).  He selected a retirement date of September 28, 2014—over ten weeks later—so he would receive all of his vacation pay.  (*Id*.). Plaintiff claims that he retired on September 28, 2014, "[d]ue to the unbearable stress, hardship, and pressure" Defendant placed on him.  (Doc. 1 at ¶ 30).

Plaintiff filed the instant lawsuit against Defendant on October 27, 2015, asserting five claims.  (*Id*.).  In Count I, Plaintiff claims that Defendant acted with a "deliberate intent to injure" him because management was aware of his medical conditions but nonetheless required him to work as a Pulp Mill Operator.  (*Id*. at ¶¶ 31–37).  In Counts II and III, Plaintiff asserts that Defendant constructively discharged him and discriminated against him.  (*Id*. at ¶¶ 38–47, ¶¶ 48–60).  Further, Plaintiff claims he retired on September 28, 2014, because he believed "his termination was imminent."  (*Id*. at ¶¶ 45–46, ¶¶ 58–59).  In Count IV, Plaintiff claims retaliatory discharge.  (*Id*. at ¶¶ 61–69).  Finally, Defendant alleges intentional infliction of emotional distress.  (*Id*. at ¶¶ 70–83).

## II.     LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see id.* at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be

drawn in [her] favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970))).  A

genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving

party.  *Anderson*, 477 U.S. at 248; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986) (explaining that "genuine" amounts to more than "some metaphysical

doubt as to the material facts").  Consequently, the central issue is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

## III.     DISCUSSION

### A.     Count I:  Deliberate Intent to Injure

In Count I, Plaintiff asserts a cause of action under Ohio Revised Code § 2745.01, which

governs intentional tort claims against employers.  That statute provides, in relevant part:

> (A) In an action brought against an employer by an employee . . .  for damages
> resulting from an intentional tort committed by the employer during the
> course of employment, the employer shall not be liable unless the plaintiff
> proves that the employer committed the tortious act with the intent to injure
> another or with the belief that the injury was substantially certain to occur.
>
> (B) As used in this section, "substantially certain" means that an employer acts
> with deliberate intent to cause an employee to suffer an injury, a disease, a
> condition, or death.

Ohio Revised Code § 2745.01(A), (B).

Although § 2745.01(A) appears to provide for two distinct bases for liability—(1) where

the employer acted "with the intent to injure another" and (2) where the employer acted "with the

belief that the injury was substantially certain to occur"—§ 2745.01(B)'s definition of

"substantially certain" limits liability to circumstances where the employer acts "with the intent

to injure another" or "with deliberate intent to cause an employee to suffer an injury, a disease, a

condition, or death."    *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 603 (6th Cir. 2013).

Consequently, tort-law remedies for workplace injuries in Ohio are limited to those resulting from the employer's deliberate intent to injure. *Id.* For all other workplace injuries, the employee's sole avenue of redress is the worker's compensation system. *Id.* (quoting *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 134 Ohio St. 3d 491, 497 (2012)); *see also Stetter v. R.J. Corman Derailment Servs., LLC*, 125 Ohio St. 3d 280, 290 (Mar. 30, 2010) (stating that "workers' compensation recovery is a meaningful remedy for workers whose injuries result from conduct committed with an intent less than deliberate intent, such as conduct that is reckless…."). A plaintiff bears the burden of producing evidence of the employer's deliberate intent to injure. *Rudisill*, 709 F.3d at 608.

Plaintiff claims two pieces of evidence prove that Defendant promoted him to Pulp Mill Operator with the "deliberate intent" to cause him "injury, disease, a condition, or death." First, Plaintiff relies on a November 4, 2014, letter from Dr. Jeffrey M. Cochran, his orthopedist. Referencing Plaintiff's back injuries, Dr. Cochran recommended that Plaintiff "remain in the job position he has currently." (Doc. 38-1, PAGEID #: 416). Dr. Cochran further stated, "I do not recommend that [Plaintiff] have any job that requires him to be in one position, especially sitting all day long." (*Id.*). Second, Plaintiff relies on a telephone call he had with Defendant's General Manager Steve Devlin on November 14, 2013. (Doc. 38-1, PAGEID #: 419). During that call, Plaintiff expressed that, due to his "heart issues, diabetes etc.," his promotion to Pulp Mill Operator would "kill him." (*Id.*).

According to Plaintiff's argument, it "is absurd to state that an employer with actual notice from a doctor and the client of a medical risk does not act with intent to harm when it intentionally disregards it and subjects the employee to the condition." (Doc. 39, PAGEID #: 438). In other words, Plaintiff infers that, because Defendant allegedly disregarded his health

6

restriction and nonetheless promoted him, it acted with deliberate intent to cause him harm. (*Id*.).  This Court disagrees and finds that neither piece of evidence, alone or in combination, is sufficient to demonstrate that Defendant deliberately intended to injure Plaintiff by promoting him to the Pulp Mill Operator Position.

As an initial matter, Defendant's decision to promote Plaintiff was not based on its intent to injure, but instead because he was next in line for a mandatory promotion under the union contract. (Doc. 38-1, PAGEID #: 412 at ¶ 3).  Further, the record demonstrates that Defendant took affirmative steps to prevent problems that could arise in the new position.  Upon receipt of the orthopedist's letter and numerous complaints from Plaintiff, Defendant discussed how to accommodate his medical conditions.  In an affidavit, Defendant's Human Resources Manager Christopher Fisher states, "it was no problem for the company for Mr. Oszust to move around the control room and/or do stretching exercises as he worked as an operator, and we communicated this through Mr. Cullison (Plaintiff's union representative), and I did not communicate anything to the contrary to anybody."  (*Id*.).

There is also a series of emails dated November 14, 2013—the day Plaintiff learned of the promotion—which consider his complaints.  Defendant's nurse Gwen Miller states in an email to Mr. Fisher, "I advised him (Mr. Oszust) that we had discussed the change of activity with the move up and we're going to advise him to talk with Dr. Cochran about appropriate stretches that would be helpful." (*Id*., PAGEID #: 418).  In another email, Mr. Devlin states that he told Plaintiff he would not consider freezing him in his current position until proper medical documentation was in place or until the company was certain it could not provide him reasonable accommodations.  (*Id*., PAGEID#: 419).  That same day, Mr. Fisher stated in an email to numerous company personnel:

7

> I feel we could reasonably accommodate the doctor's suggestions.  Charlie is only required to be sitting at the panel 10-15 minutes each hour while he collects data and possibly up to 45 minutes at a time if he is starting up or shutting down the pulpmill.  Otherwise he would be able to get up, stretch, if needed and walk around in front of the panel.  He could also contact his doctor to get some suggested stretches or exercises if needed.

*Id.*

Moreover, despite Plaintiff's complaints concerning potential risk to his heart, Plaintiff had received a clean bill of health, with no restrictions, from his cardiologist. (Doc. 36, PAGEID #: 227).  Plaintiff provided no additional medical documentation to demonstrate to Defendant that the added stress of being switched to Pulp Mill Operator would be detrimental to his health. (Doc. 38-1, PAGEID#: 419).   Indeed, Defendants were confident that Plaintiff could fulfill the position because he had done so for six weeks in spring 2013.  (*See* Doc. 36, PAGEID #: 260).

Based on the forgoing, Plaintiff fails to satisfy his burden of producing evidence of Defendant's deliberate intent to injure him.  Indeed, the evidence demonstrates that Defendant did not believe that promoting Plaintiff to Pulp Mill Operator was substantially certain to cause him injury.  Consequently, Defendant's Motion for Summary Judgment on Count I of the Complaint is **GRANTED**.

### B.      Counts II and III:  Constructive Discharge and Disability Discrimination

In Count II, Plaintiff alleges that he was constructively discharged by Defendant. However, "[c]onstructive discharge is not itself a cause of action, but rather a means of proving the element of an adverse employment action where the employee resigns instead of being fired." *Johnson v. AK Steel Corp.,* No. 1:07-CV-291, 2008 WL 2184230, at *11 (S.D. Ohio May 23, 2008) (citing *Corbett v. Harvey*, No. 2:06-CV-761, 2008 WL 731487, *11–12 (S.D. Ohio 2008)); *see also Pozsgai v. Ravenna City Schools Bd. of Educ.*, No. 5:10CV2228, 2012 WL 1110013, at *11 (N.D. Ohio Mar. 30, 2012) (finding that a claim for constructive discharge is not

"a standalone entitlement for relief").  Consequently, Plaintiff must allege a broader claim for employment discrimination.  *Starks v. New Par*, No. 98-1300, 1999 WL 357757, at \*5 (6th Cir. May 11, 1999) (citing *Kroll v. The Disney Store*, 899 F. Supp. 344, 347 (E.D. Mich. 1995)). Here, Plaintiff brings a disability discrimination claim in Count III.

Because constructive discharge is not an independent cause of action, Defendant's Motion for Summary Judgment is **GRANTED** as to Count II of the Complaint.  The Court shall consider Plaintiff's allegations regarding his constructive discharge within the context of Count III.

Count III fails to satisfy basic pleading standards.  Specifically, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Count III fails to identify any statute or law that is the basis for the cause of action.  Hence, it not discernable whether Plaintiff is attempting to bring claims under state or federal law, and his claim is subject to dismissal on this basis.

In opposing summary judgment, Plaintiff suggests, but doesn't state outright, that his disability discrimination claim may have been brought under Ohio law.  (*See* Doc. 39 at 13; *id*. at n.12).  Assuming Plaintiff brings Count III under Ohio's anti-discrimination statute in Chapter 4112 of the Ohio Revised Code, his claim is analyzed under the same standards applicable to claims brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). *See Johnson v. JPMorgan Chase & Co*., 922 F. Supp. 2d 658, n.6 (S.D. Ohio Feb. 6, 2013) (noting that "Ohio disability discrimination law generally applies the same analysis as the ADA" and Ohio courts "look to regulations and cases interpreting the ADA for guidance in their interpretation of Ohio law") (citation and alterations omitted).  In order to establish a *prima facie*

9

case of disability discrimination, a plaintiff must show (1) he has a disability; (2) that he is "otherwise qualified" for the job; and (3) that defendant either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability. *Brantley v. Cinergy Corp.*, No. 1:01CV378, 2007 WL 2462652, at *24 (S.D. Ohio Aug. 27, 2007) (citing *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997)). Defendant argues that Plaintiff fails to satisfy the first and third prongs.

### 1.     Whether Plaintiff Suffers From A Disability Under The Relevant Law

The ADA defines disability as having "a physical or mental impairment that substantially limits one or more major life activities," having "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)–(C).  Plaintiff's Complaint alleges that he is disabled due to diabetes and back problems.  (Doc. 1 at ¶ 49).  In its Motion for Summary Judgment, Defendant cites Plaintiff's deposition testimony in support of its argument that Plaintiff does not satisfy the definition of disabled.  (Doc. 38 at 20–21).  The relevant testimony states:

> Q. Have you ever considered your diabetes to be a disability?
> A. Never.
> Q. You have back problems, right?
> A. I do.
> Q. Do you consider the back problems to be a disability?
> A. No.
> Q. Do they limit you in your day-to-day life?
> A. No.
> Q. Does your diabetes limit you in your day-to-day life?
> A. No.
> Q. Has it ever?
> A. No.
> Q. Has your back ever limited you in your day-to-day life?
> A. Well, before I had the surgery, it did.
> Q. But not since you had surgery?
> A. No.

(Doc. 36, PAGEID #: 247).   Defendant argues that "[n]o jury could find that Plaintiff is substantially limited when he himself says that he never has been."  (Doc. 38 at 21).

Although Plaintiff states "[c]learly this argument is somewhat absurd on its face," some courts have considered whether a plaintiff regards himself disabled.  *See, e.g.*, *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 884 (6th Cir. 1996) (stating that plaintiff's deposition testimony shows that she did not belief her health problems "limited her activity in any way.  By her own admission, therefore, she does not have an impairment that limits her major life activities") (footnote omitted); *Brunskill v. Kansas City S. Ry. Co.*, No. 06-205-CV-W-REL, 2008 WL 413281, at *23 (W.D. Mo. Feb. 12, 2008) (noting that "Plaintiff does not consider himself disabled and does not believe that his color perception deficiency limits his ability to perform daily tasks"); *Wells v. Huish Detergents, Inc.*, No. 1:98CV-131-R, 1999 WL 33603335, at *5 (W.D. Ky. Nov. 30, 1999) ("In fact, [plaintiff] reports that he does not consider himself disabled today.").  Perhaps more significantly, Plaintiff points to no evidence demonstrating that he meets the definition of disabled.   Instead, Plaintiff makes general statements concerning his impairments.  (*See, e.g.*, Doc. 39 at 15–16 ("there is clear evidence in this case that Plaintiff does have back problems and is a diabetic"); *id*. at 16 (claiming that sitting causes his blood sugar to rise and causes pain and stiffness in his back and legs)).

Plaintiff mentions just one piece of evidence in claiming that he satisfies the definition of disabled—Dr. Cochran's November 4, 2014 letter, which he states contained a "clear restriction" that prevented him "from working in a sedentary position."  (*Id*. at 16).   However, "to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999) (citing 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job

11

does not constitute a substantial limitation in the major life activity of working")).  Plaintiff's

perspective, which is supported by Dr. Cochran's letter, is that he could have effectively resumed

work as a Pulp Mill Operator Helper.  (*See, e.g.*, Doc. 39 at 17 (explaining Plaintiff requested to

return to work and there is no question that was cleared by his orthopedist and cardiologist)).

Thus, Plaintiff is not substantially limited in the major life activity of working.

Stated simply, Plaintiff has failed to direct this Court to any evidence demonstrating that

his impairment substantially limits one or more of his major life activities, that he had a record of

such an impairment, or was being regarded as having such an impairment.  *See* 42 U.S.C.

§ 12102(1)(A)–(C).  Thus, Plaintiff fails to establish that he suffers from a disability under the

relevant law.

### 2. Whether Defendant Made An Adverse Employment Decision Because Of His Disability

Even if Plaintiff were able to prove that he suffered from a disability, he also must show

that Defendant made an adverse employment decision because of his disability.  Plaintiff appears

to parse constructive discharge and "other adverse employment actions" allegedly taken against

him as a result of his disabilities.  (*See, e.g.*, Doc. 39 at 16 ("Plaintiff has clearly presented

evidence to support a constructive discharge.  On top of that, there is evidence of several other

'adverse employment actions' taken as a result of his disabilities.")).  Thus, the Court will do the

same in determining if there is a genuine issue of material fact.

### a. Constructive Discharge

To prove a claim for constructive discharge, Plaintiff "must show that working conditions

would have been so difficult or unpleasant that a reasonable person in [his] shoes would have felt

compelled to resign."  *Kocsis*, 97 F.3d at 887.  Plaintiff must also demonstrate that Defendant

acted intentionally and with intent for him to resign.  *Aslept v. Honda of Am. Mfg., Inc.*, No.

3:11-cv-395, 2013 WL 2417980, at *6 (S.D. Ohio June 3, 2013).  In applying that standard, the Court may consider the presence of the following factors, either alone or in combination:  (1) a demotion; (2) a reduction in salary; (3) a reduction in job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  *Id*. (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001)).

"Feelings of the employee alone cannot establish a constructive discharge; the constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 382 (6th Cir. 1993) (internal quotations and citations omitted).  In other words, Plaintiff's interpretation of Defendant's actions is not evidence.  *Spence v. Potter*, No. 1:07-cv-526, 2010 WL 518179, at *12 (S.D. Ohio Feb. 3, 2010) (citing *LaPointe*, 8 F.3d at 382)).  Further, "the manner in which an employer criticizes an employee's job performance, such as following rules, has been found insufficient to establish constructive discharge."  *Id*. (citing *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (discussing cases and finding no constructive discharge where employee contended he was unfairly criticized and placed on performance improvement plan); *Caslin v. Gen. Elec. Co.*, 696 F.2d 45, 47 (6th Cir. 1982) (same); *Bielert v. N. Ohio Prop.*, 863 F.2d 47 (6th Cir. 1988) ("An employer does not constructively discharge an employee simply by advising him that he must be productive in order to retain his new job.")).

13

Plaintiff points to two specific events to support his constructive discharge claim.  (*Id*. at 13–15; *but see* Doc. 36, PAGEID #: 224 (Plaintiff's testimony that the "last chance agreement" was the only reason he retired)).  First, Plaintiff cites his promotion to Pulp Mill Operator despite Dr. Cochran's letter indicating that he was unable to perform a sedentary job.  (Doc. 39 at 14). Second, Plaintiff cites Defendant's requirement that he sign a "last chance agreement" stating that he would be terminated if any future work issues arose.  (*Id*.).

The evidence demonstrates that Defendant promoted Plaintiff from Pulp Mill Helper to Pulp Mill Operator due to a mandatory promotion or "forced move up" required by Plaintiff's union contract.  (Doc. 38-1 at ¶ 3; Doc. 35, PAGEID #: 140).  And even if the promotion hadn't been forced, Plaintiff had lobbied for the position.  (Doc. 38-1 at ¶ 3; *see also* Doc. 35, PAGEID #: 141 (Plaintiff's testimony that he wanted the training and job)).  Further, as discussed *supra*, Defendant addressed how to accommodate Plaintiff's medical conditions and concluded that he could do the job successfully if he were able to move around the control room and/or do stretching exercises.  (Doc. 38-1, PAGEID #: 412).  Thus, the evidence does not support Plaintiff's position that Defendant promoted him with intent for him to resign.  *See Aslept*, No. 3:11-cv-395, 2013 WL 2417980, at *6.  To the contrary, the evidence demonstrates Defendant's belief that Plaintiff could work successfully as Pulp Mill Operator.  (*See id*.).

As to the "last chance agreement," the evidence demonstrates that Defendant asked Plaintiff to sign it after he had been involved in a number of incidents that Defendant deemed unacceptable (Doc. 36-3, PAGEID #: 303), the most recent of which was a verbal altercation on June 12, 2014 with his union representative (*Id.*; Doc. 36, PAGEID #: 256).  Plaintiff described that incident as follows:

> He got up in my face and started wagging his finger.  And I told him—I said, "John, you better back your ass up."  He backed up and started to walk away.

> And I just kind of muttered to myself, "What a piece of shit." He heard me. He come running back on me. "What did you say? What did you say?" I said, "John, you get out of my face. I'm telling you right now, get out of my face." He backed up, and I said, "I called you a piece of shit." He walked out the door. And then, he come back in and said something. And I said, "Oh, just go on your way John. You're no good."

(Doc. 36, PAGEID #: 256). Although Plaintiff disagrees with Defendant's position that his behavior was unacceptable (*id*., PAGEID #: 246), Plaintiff signed the agreement with his union representative present and after having discussed it with him. (*Id*., PAGEID #: 246; Doc. 36-3, PAGEID #: 303).

Plaintiff offers no evidence to support his position that Defendant made him sign the "last chance agreement" with the intent to cause him to resign. He likewise fails to offer evidence demonstrating that Defendant should have reasonably foreseen that Plaintiff would resign based on the "last chance agreement." To the contrary, the evidence demonstrates that the "last chance agreement" was based on work-related incidents in which Defendant found Plaintiff's behavior to be unacceptable. That alone is insufficient to prove constructive discharge. *See, e.g.*, *Agnew*, 286 F.3d at 310 (finding that employer's criticism and institution of performance improvement plan do not constitute objectively intolerable conditions).

### b. Other Adverse Employment Actions

Plaintiff again points to two specific events to support his argument that Defendants took other adverse employment actions against him. First, Plaintiff claims that Defendant "attempted to disallow [him] from coming back to work" after he suffered the syncopal episode in November 2013. (Doc. 39 at 16). Next, Plaintiff asserts that, after the "last chance agreement" was signed, Defendant instructed employees "to watch [him] closely in an effort to catch any slip up." (*Id*. at 14).

15

Even if Plaintiff were able to establish a *prima face* case of employment discrimination showing that Defendant's decision to disallow him to return to work for a period of time was an adverse employment action, the burden would then shift to Defendant to articulate a legitimate, nondiscriminatory reason for its decision. *Reid v. Rexam Beverage Can Co*., 434 F. Supp. 2d 500, 505 (N.D. Ohio 2006). If Defendant is able to articulate a legitimate, nondiscriminatory reason, the burden would then shift back to Plaintiff to demonstrate pretext. *Id*.

The record reflects that the syncopal episode in November 2013 came shortly after Plaintiff had suffered a heart attack in October 2013. (Doc. 35, PAGEID #: 124). In Mr. Fisher's affidavit, he explains that these two medical incidents, in addition to Plaintiff's pending worker's compensation claim, prompted Defendant to use its common procedure of having an IME to assess Plaintiff's ability to return to work. (Doc. 38-1, PAGEID #: 412–13 at ¶ 4). Dr. Sethi performed the IME and determined that Plaintiff was unable to return to work. (*Id*., PAGEID #: 413 at ¶ 4). Defendant met with Plaintiff to inform him of Dr. Sethi's opinion. (*Id*.). Mr. Fisher states:

> Almost two months after the meeting, I received a letter from a lawyer representing Mr. Oszust, stating that Mr. Oszust should be allowed to return to work. As soon as Mr. Oszust provided clearance from his cardiologist, he was returned to work on June 6, 2014.

(*Id*.). Finally, Mr. Fisher adds that he deals with lawyers regularly as Defendant's Human Resources Manager, and he had no concerns with Plaintiff seeking legal counsel to assist him in this matter. (*Id*.).

Thus, Defendant has proffered a legitimate, nondiscriminatory reason for refusing Plaintiff's return to work—its belief that doing so could be a threat to Plaintiff's health. Further, Defendant has substantial evidence to support this reason based on Dr. Sethi's findings. Plaintiff cannot satisfy his burden of proving pretext for a discrimination claim by, "without more,

16

questioning the employer's business judgment." *Reid*, 434 F. Supp. 2d at 506–507.  Because

Plaintiff offers nothing more than his own opinion and speculation that Defendant's proffered

reason is a pretext, his claim based on a delayed return to work fails.  (*See, e.g.*, Doc. 39 at 16–17

(arguing that "a reasonable jury may not believe that defendant was suddenly concerned about

plaintiff's health when it refused to allow plaintiff to come back to work.  This is particularly so

when the decision to prevent [him] from returning was based on a report from a hired gun doctor

selected to make this very opinion.")).

Plaintiff's claim of an adverse employment action based on Defendant's alleged

instruction for employees to watch him is likewise deficient.  Defendant took no disciplinary

action against Plaintiff between the "last chance agreement" and his retirement.  (Doc. 36,

PAGEID #: 225).  Co-worker monitoring does not constitute an adverse employment action

unless Plaintiff presents evidence that it was materially adverse to his job status.  *See Monaco v.*

*Quest Diagnostics, Inc.*, No. 08-2500-KHV, 2010 WL 3843622, at *10 (D. Kansas Sept. 24,

2010) (citing *Tapia v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006)).  Because

Plaintiff fails to present evidence that co-worker monitoring was materially adverse to his job

status, he fails to demonstrate an adverse employment action on this basis.

Based upon the foregoing, Plaintiff fails to establish a *prima face* case of disability

discrimination.  Specifically, Plaintiff fails to demonstrate that his back pain and diabetes

constitute a disability under the relevant law and that Defendant made an adverse employment

decision regarding him solely because of his disability.  *See Brantley*, No. 1:01CV378, 2007 WL

2462652, at *24.  Moreover, even if Plaintiff were able to establish a *prima face* case of

employment discrimination showing that Defendant's decision to disallow his to return to work

for a period of time was an adverse employment action, Defendant has articulated a legitimate,

nondiscriminatory reason for its decision that Plaintiff has not shown to be a pretext for discrimination.   Thus, Defendant's Motion for Summary Judgment on Count III of the Complaint is **GRANTED**.

### C.      Count IV:  Retaliatory Discharge

"Without a showing of circumstances supporting a factual issue regarding [Plaintiff's] claim of constructive discharge, no discharge exists to support [Plaintiff's] wrongful-discharge claim, and it too fails." *Aslept*, 2013 WL 2417980, at *10 (*quoting Keller v. Allstate Ins. Co.*, 146 F. App'x 764, 766 (6th Cir. 2005)).   Indeed, the evidence demonstrates that Plaintiff retired voluntarily—he was under no deadline to retire, picked his own retirement date, and gave over two months' notice so he would receive all of his vacation pay.   (Doc. 38 at 17).   Thus, Plaintiff's wrongful termination claim is without merit and Defendant's Motion for Summary Judgment on Count IV of the Complaint is **GRANTED**.   *Aslept*, 2013 WL 2417980, at *10. ("Because he voluntarily resigned, Plaintiff cannot maintain a claim for wrongful termination.").

### D.      Count V:  Intentional Infliction of Emotional Distress

Finally, in order to state a claim for intentional infliction of distress under Ohio law, the plaintiff must plead that:

> (1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008).   Even construing the facts in the light most favorable to Plaintiff, he fails to raise a genuine issue of material fact concerning outrageous conduct or serious emotional distress to survive Defendant's

18

Motion for Summary Judgment. *See Dooley v. Wells Fargo Bank, Nat. Ass'n*, 941 F. Supp. 2d 862, 869 (S.D. Ohio Apr. 19, 2013). Further, the claim is also deficient based on Plaintiff's failure to cite to any evidence demonstrating that he indeed suffered a psychic injury. *See Williams v. Nice*, 58 F. Supp. 3d 833, 840 (N.D. Ohio Sept. 30, 2014); (*see, e.g.*, Doc. 35, PAGEID #: 125 (Plaintiff testifying that he has never seen a psychiatrist, psychologist, or counselor)). Therefore, Defendant's Motion for Summary Judgment on Plaintiff's claim of intentional infliction of emotional distress is **GRANTED**.

## IV.    CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment is **GRANTED**. (Doc. 38). The Clerk is **DIRECTED** to enter judgment in favor of Defendant and against Plaintiff. This case is **TERMINATED**.

IT IS SO ORDERED.


Date: March 17, 2017                          /s/ Kimberly A. Jolson
                                              KIMBERLY A. JOLSON
                                              UNITED STATES MAGISTRATE JUDGE